# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MINITUBE OF AMERICA, INC.,

                              Plaintiff,

v.

REPRODUCTION PROVISIONS, LLC,
MINITÜB GMBH, and
MINITUBE INTERNATIONAL AG,

                             Defendants.

Case No. 13-CV-685-JPS

ORDER

This is nominally a patent case (*see* Docket #4), and to be sure it does involve allegations of patent infringement (*see* Docket #1, Exs. 1, 2). But, in reality, it is best viewed as a multi-faceted business dispute between family members. At its core, the case derives from competitive advances made by one family-affiliated business—the Europe-centered Minitüb GmbH, and various related entities—into the American market controlled by another. Minitube of America, Inc., has controlled the American market for years, as part of an informal agreement between its principals and the principals of Minitüb GmbH. Seeing as those principals are all family members, there likely was little urgency to formalize any understanding (explicit or implicit) between the parties. Likewise, the principals of Minitube of America, Inc., probably never expected their European counterparts to begin encroaching on the American market.

But, Minitüb GmbH did just that, leading Minitube of America, Inc. to file this suit. (Docket #1). In turn, Minitüb GmbH filed a number of counterclaims. (Docket #16).

Thus, now before the Court is a twisted gnarl of claims—patent, trademark, business disputes, and more—that largely turn on the existence and content of informal agreements between the parties. The parties, in turn, have filed cross-motions for summary judgment (Docket #32, Docket #45), which are fully briefed (Docket #47, #57, #67, #82, #87, #99) and thus ready for resolution.

To say that this case is complex would be a vast understatement. But the Court has thoroughly reviewed the parties' submissions and will do its best to address the relevant facts and arguments in a manner that is both thorough and succinct. To do so, the Court will begin by setting forth a detailed version of the underlying facts. Thereafter, the Court will address the substantive arguments and applicable law.

1.      BACKGROUND

As already mentioned, the facts underlying this case are complex. They involve informal business arrangements across continents between family members, simmering tensions between those family members, and still-evolving business decisions. Fortunately, the parties have stipulated to certain facts. (Docket #30 (the statement of stipulated facts, which the Court will refer to as "SF")). But the parties continue to disagree over certain events. (*See, e.g.*, Docket #69, Ex. 1; Docket #79).[1] Here, the Court sets out the relevant background facts. After discussing the factual background, the Court will recount the totality of the claims being alleged by the parties.

---

[1]Those documents are, respectively, the parties' responses to proposed findings of fact. The Court will refer to the plaintiff's proposed findings of fact (Docket #40) as "PPFF," and the defendant's (Docket #49) as "DPFF."

### 1.1 Factual Background

Because the factual background of this case is so complex, the Court divides this discussion into multiple parts. First, the Court provides some background about the identity of the parties and their respective owners. Second, the Court provides additional historic context by describing the relationships between the parties and the properties owned by them. Third, the Court recounts the more recent actions giving rise to this specific lawsuit. Fourth, the Court discusses the recent sale of Minitube of America, Inc., to another business.

#### 1.1.1 The Parties

For purposes of simplicity, the Court will refer to Minitube of America, Inc., as "Minitube of America" for the remainder of this order. Likewise, the Court will refer to Minitüb GmbH and its affiliated entity—Minitube International AG ("MTI")—as "Minitüb Germany," and will also refer to them collectively as a single company of the same name.

Minitube of America and Minitüb Germany are engaged in similar business. Both develop, manufacture, and supply products that are used on farms to assist in livestock reproduction. (SF ¶¶ 5, 8). For instance, both companies manufacture products intended to assist in artificial insemination and embryo transfer of livestock. (SF ¶¶ 5, 8).

Both companies are also owned by separate groups of family members. Ludwig Simmet owns Minitube of America in conjunction with his wife, Rebekah (and three trusts for Ludwig's and Rebekah's daughters). (SF ¶ 4). Minitube of America is a Wisconsin corporation and domiciled in Verona, Wisconsin. (SF ¶ 3). Meanwhile, Ludwig's brothers—Christian, Florian, and Rudolf—own Minitüb Germany which is located in Tiefenbach,

Germany. (SF ¶¶ 6–7, 10). Richard and Debra Shoenbeck are of no apparent relations to the Simmets; they operate Reproduction Provisions, which is registered as a Wisconsin LLC, and operates from Walworth, Wisconsin.

Reproduction Provisions, LLC, is also named as a defendant, but is owned by a different group of individuals (SF ¶¶ 11–12); the Court will refer to it as "Reproduction Provisions." Reproduction Provisions distributes artificial reproduction products for livestock, of the sort marketed by Minitube of America and Minitüb Germany. (SF ¶ 41).

### 1.1.2 The Parties' Relationship and Properties

This section provides pertinent historical information regarding: the creation of Minitüb Germany and Minitube of America; the relationship and operations between them; the properties owned and developed by them; and additional information regarding the relationship between Minitube of America and Reproduction Provisions.

#### 1.1.2.1 Creation, Operations, and Relationships of Minitüb Germany and Minitube of America

The Simmets' father and mother established Minitüb Germany in Germany in 1970.[2] (SF ¶ 15). They retired in 1996. (SF ¶ 18).

Before their retirement, the seeds of this suit had been sown: in 1986, Ludwig formed Minitube of America in Wisconsin, using funds from Minitüb Germany to establish the business. (SF ¶ 17; PPFF ¶ 3; DPFF ¶ 4 and Resp.). Christian, meanwhile, took over Minitüb Germany as CEO in 1993, and operated the company in Germany. (SF ¶ 18).

---

[2]At that time, the parents founded only Minitüb GmbH. Minitube International, AG (MTI), was formed later to allow for a merger between the American and German companies. (SF ¶ 26). That merger ultimately fell through. (SF ¶ 27).

At the time, this division did not create a problem. Indeed, the two companies appear to have operated harmoniously in separate geographic areas—Minitube of America in North America (beginning operations in Canada in 1996 and Mexico in June 2001), Minitüb Germany in Germany and elsewhere in the world—but collaborated on much of their manufacturing, research and development, and sales. (SF ¶¶ 20, 23; PPFF ¶¶ 1 and Resp. (establishing the location and time frame of Minitube of America's operations; the defendants dispute whether Minitube of America violated agreements by operating in Canada and Mexico, but not that the company did operate there), 6–7 and Resps. (making clear that encroachment in Canada and Mexico was, at least, allowed by Minitüb Germany), 9 and Resp. (establishing that Minitüb Germany generally sells its products throughout the world, with the exception of the North American market); *see also* DPFF ¶¶ 3, 6–9 and Resp.). In fact, both companies typically marketed and sold the same products and used the same trademarks, albeit in their separate geographic areas. (SF ¶¶ 21, 23). Occasionally, the companies would even purchase products from one another. (SF ¶ 22).[3]

Of particular relevance to some of the claims in this suit, the companies would often share trade-sensitive information. For example, Minitüb Germany shared information with Minitube of America about its supplier of a certain chemical used in its products and other manufacturing techniques. (*See* PPFF ¶¶ 54–59 and Resp.). In spite of that fact and the fact

---

[3]The parties dispute whether Minitube of America was allowed to manufacture products that Minitüb Germany typically manufactured and sold. (*See* PPFF ¶ 13 and Resp.). But, for at least two years, Minitube of America manufactured the US BAG product—the subject of the patent at dispute in this case—and sold it to Minitüb Germany; this practice constituted a reversal of the parties' typical arrangement. (PPFF ¶ 13 and Resp.).

that all other Minitüb Germany distributors sign agreements including a confidentiality clause, Minitüb Germany never required Minitube of America to sign written confidentiality agreements and were not extremely diligent about marking information as a trade secret.[4] (PPFF ¶ 88, 90 and Resp.).

Given the extreme closeness of the companies' involvement with one another, they discussed merging. (SF ¶ 25). In 2009, the companies formed MTI with the hope that it would provide an appropriate structure for the two companies to merge. (SF ¶ 26). Those discussions failed, though, and Minitüb Germany seemingly began to operate MTI. (SF ¶ 27; *see* SF ¶¶ 28–29). Despite the failure of merger negotiations, Minitube of America told its customers that it would no longer present itself as affiliated with Minitüb Germany, but that the companies would still cooperate in limited fashion. (DPFF ¶ 13 and Resp.). In keeping with that representation, Ludwig asserted his right to sell Minitube of America to a third party and sharply reduced orders from Minitüb Germany between 2012 and 2013. (DPFF ¶¶ 14–15 and Resp.). In fact, in a departure from the parties' standard procedure, Minitube of America began manufacturing US BAGs[5] on its own in 2012, without informing Minitüb Germany of that fact; thus, in 2013, Minitube of America did not purchase any US BAGs from Minitüb Germany. (DPFF ¶¶ 37, 38).

---

[4]Minitüb Germany asserts that it labeled "many documents for 'in house use' over the course of" the companies' relationship. (Response to DPFF ¶ 93).

[5]The US BAG is a product based upon the '503 patent asserted in this case.

Despite the companies' significant economic entwinement and occasionally antagonistic relationship, they never entered into any written agreements with one another.[6] (SF ¶ 24).

### 1.1.2.2   The '503 Patent

Ludwig and Christian—owners of Minitube of America and Minitüb Germany, respectively—together invented a boar semen collection bag and jointly received a patent thereon in 1999. (SF ¶¶ 30–31, 33). In spite of the fact that they had co-invented the bag, they assigned the full and exclusive right, title, and interest in the patent covering it—U.S. Patent No. 5,961,503 ("the '503 patent")—to Minitube of America. (SF ¶¶ 30, 32, 33). In other words, Christian relinquished his rights to the '503 patent, essentially doing so in favor of Ludwig, by virtue of the fact that Ludwig owned and operated Minitube of America, the recipient of those rights. (SF ¶ 32).

It is not clear exactly *why* Christian did so. However, from the facts, the Court can surmise that there was likely an informal agreement between Ludwig and Christian that Minitüb Germany would be allowed to market the product based upon the '503 patent, which the parties call the US BAG. (SF ¶ 30). Both Minitube of America and Minitüb Germany marketed the US BAG, and apparently Christian was under the impression that he would receive a perpetual license to sell the US BAG. (DPFF ¶ 33 and Resp.).

---

[6]The parties disagree over the admissibility and import of a letter sent to Ludwig from his father and mother, allegedly setting forth the basic terms of the agreement governing the companies' relationship. (DPFF ¶¶ 4–5 and Resp.).

### 1.1.2.3  The Companies' Trademarks

In addition to the '503 patent, Minitube of America also owns the United States trademark to several marks it uses in promotion and products:

(1)  U.S. Reg. No. 2,038,251, covering

MINITUBE

(2)  U.S. Reg. No. 2,051,949, covering



The Court will refer to this mark as "the MOFA mark."

(3)  U.S. Reg. No. 2,096,385,  covering



The Court will refer to this mark as "the ovum mark."

(4)  U.S. Reg. No. 3,250,053, covering

AUTOMATE

(5)  U.S. Reg. No. 2,033,439, covering

ANDROHEP

(6)  U.S. Reg. No. 4,494,111, covering

US BAG[7]

---

[7]It was not until June 9, 2013, that Minitube of America filed a trademark application seeking to register the US BAG mark. (PPFF ¶ 27). Minitüb Germany disputes whether Minitube of America should be entitled to exclusive license in that mark, but there can be no dispute that the trademark was issued to Minitube of America on March 11, 2014. (*See* PPFF ¶¶ 27–29 and Resp.).

(SF ¶ 34; PPFF ¶ 27). Minitüb Germany also owns a U.S. trademark: in 2001, it obtained U.S. Reg. No. 2,493,812, covering the ANDROSTAR trademark.[8] (SF ¶¶ 35–37).

### 1.1.2.4 Minitube of America's Prior Dealings with Reproduction Provisions

The relationship between Minitube of America and Reproduction Provisions is somewhat fraught and dates back to a time when Reproduction Provisions operated under a different name. (*See* SF ¶¶ 13 (noting that Reproduction Provisions was previously named Prairie Provisions, LLC), 39–40)). In 1999, Minitube of America sued Reproduction Provisions, then known as Prairie Provisions, LLC, in the United State District Court for the Western District of Wisconsin for infringing the '503 patent. (SF ¶ 40). A settlement resulted in 2000, in which Reproduction Provisions agreed not to make, use, offer, or sell any product infringing the '503 patent until the expiration thereof. (SF ¶ 40).

### 1.1.3 Disputes Begin to Arise Between the Parties

After what appears to have been a bitter merger negotiation ending in April of 2012 (PPFF ¶¶ 17–19 and Resp.), Minitüb Germany began to make inroads into the North American market.

Minitüb Germany started in Mexico. There, in 2012, it hired two then-current and one then-former employees of Minitube Mexico (Minitube of America's Mexican subsidiary). (PPFF ¶¶ 34 and Resp.) Having done so, Minitüb Germany then launched Mexitube, selling primarily the same

---

[8]Minitube of America filed a petition to cancel the ANDROSTAR mark. (SF ¶ 38). That proceeding is stayed pending outcome of this case. (SF ¶ 38). The parties disagree over the extent to which Minitüb Germany used the ANDROSTAR mark and over who owns the ANDROCOLL mark in the United States. (PPFF ¶¶ 100–109 and Resp.).

products as Minitube of America. (PPFF ¶¶ 35–36 and Resp.). This significantly impacted Minitube of America's Mexican operations, reducing its market share in the country. (PPFF ¶ 37).

Minitube of America began negotiations with a competitor that would negatively affect the Minitüb Germany-Minitube of America distribution relationship. (DPFF ¶ 16 and Resp.). Those negotiations ultimately led to a "marketing cooperation agreement," under which Minitube of America would cooperate with its previous competitor in product offerings, technical support, and customer service. (DPFF ¶ 17 and Resp.).

Given the percolating relationship between Minitube of America and a former competitor, in May of 2013 Minitüb Germany entered into its own separate agreement with a third party, naming Reproduction Provisions as the exclusive distributor for all Minitube of America products to be marketed in the United States and Canada.[9] (SF ¶¶ 42–45). Minitüb Germany informed Minitube of America of this arrangement on May 27, 2013, several days before issuing a press release about the Minitüb Germany-Reproduction Provisions relationship. (SF ¶ 28). In that same email, Minitüb Germany expressed its desire to continue working with Minitube of America on technical questions and creation of spare parts for machines. (SF ¶ 29). However, Minitüb Germany made clear that Minitube of America would no longer be able to purchase Minitüb Germany products directly from Minitüb

---

[9]In fact, these agreements were entered by MTI, rather than Minitüb Germany. The Court, however, refers to them as having been entered by Minitüb Germany for the sake of narrative simplicity.

Germany, but would instead need to make those purchases through Reproduction Provisions.[10] (SF ¶ 29).

Shortly after the Minitüb Germany-Reproduction Provisions relationship was finalized, the 2013 World Pork Expo was held in Des Moines, Iowa. (SF ¶ 46). There, Reproduction Provisions obtained a booth and represented itself as "Exclusive Distributor for Minitube International, AG Germany." (SF ¶ 46). In keeping with that representation, Reproduction Provisions displayed the following sign:



---

[10]This represented a significant departure from the parties' ordinary course of business, in which they would regularly make purchases directly from one another. (SF ¶ 22).

(SF ¶ 46). Reproduction Provisions also demonstrated the Minitüb Germany version of the US BAG product, distributing at least forty samples. (PPFF ¶¶ 45, 47 and Resp.).[11]

The Minitüb Germany-manufactured version of the US BAG, shown and distributed at the Expo, is extremely similar to the Minitube of America-manufactured version. (*See* PPFF ¶¶ 75–76). Both use the ovum mark and other similar design features and include the (obviously similar) name of the manufacturing company:




MOFA US BAG        Minitüb US BAG

---

[11]One of Minitube of America's employees engaged in the questionable tactic of approaching Reproductions Provisions' booth, where he lied that he was a buyer from Canada and allegedly received an offer for sale of the Minitüb Germany version of the US BAG. (DPFF ¶ 26). The Court has reservations about the alleged deceptiveness of this tactic, and also believes that the circumstances (similarity between the companies' names and lack of certainty about exact wording of the offer (*see* Resp. to PPFF ¶ 51)) call into question the validity of the communications.

(*See, e.g.*, PPFF ¶ 76 (citing C. Simmet Dep. 89:13-18); Compl. ¶ 27).[12]

On the last day of the Expo, Minitube of America delivered a cease-and-desist letter to Reproduction Provisions, stating that Reproduction Provisions was infringing Minitube of America's patent and trademarks. (PPFF ¶ 61; DPFF ¶ 28). Reproduction Provisions complied with the terms of that letter.

The cease-and-desist letter also affected other transactions between Minitüb Germany and Reproductions. As part of their distribution agreement, Reproduction Provisions ordered 20,000 Minitüb Germany-produced US BAGs. (PPFF ¶ 69 and Resp.; DPFF ¶ 41). A third party took possession of those bags in Germany with the intention of importing them into the United States and then shipping them to Reproduction Provisions. (PPFF ¶ 69 and Resp.). However, after receiving the cease-and-desist letter, Minitüb Germany and Reproduction provisions worked with that third party to redirect the shipment to Mexico (perhaps to avoid application of United States patent law). (PPFF ¶ 69 and Resp.; DPFF ¶ 44 and Resp. (there is some dispute over whether the shipment ever arrived in the United States)).

Despite having purchased Minitube of America-produced US BAGs for several years, Reproduction Provisions has now entirely stopped such purchases. (PPFF ¶¶ 63–64).

---

[12]In addition to the similarity of the US BAGs, there is other evidence of confusion resulting from the similarity in the companies' names. In one instance, Reproduction Provisions shipped several Minitüb Germany products to a customer. (PPFF ¶ 81 and Resp.). The shipment was damaged and, at the very least, the customer initially called Minitube of America regarding that damage, despite the fact that Minitube of America was not the manufacturer of the products. (PPFF ¶¶ 81–82 and Resp.).

#### 1.1.4    Sale of Minitube of America

In December 2013, while this case was pending, Cooperative Resources, Inc. ("Cooperative Resources"), offered to purchase Minitube of America's assets. (SF ¶ 47). Minitube of America agreed to the offer, and the transaction was completed on February 28, 2014. (SF ¶ 48). The agreement excluded the trademarks and '503 patent at play in this case, but Minitube of America and Cooperative Resources entered a separate licensing and assignment agreement allowing: (1) Cooperative Resources to exercise all of Minitube of America's rights in those properties; and (2) Minitube of America to convey the rights it retains at the close of this dispute to a separate entity created in the transaction. (SF ¶¶ 49–50).

The parties dispute whether Minitube of America has disclosed any trade secrets to Cooperative Resources, but there can be little doubt that Cooperative Resources now controls the former Minitube of America business, which likely continues to utilize practices learned through the long-term relationship between Minitüb Germany and Minitube of America. (*See* PPFF ¶¶ 54–59, 90–94, and Resp.; DPFF ¶¶ 18–19 and Resp.).

Minitube of America has also—at least temporarily—discontinued or rebranded some of its products while this case has been pending. (DPFF ¶ 49 and Resp. (Minitube of America maintains that it has not permanently discontinued or abandoned any of its marks—only that it has temporarily stopped using those marks to avoid confusion)).

### 1.2    Legal Background

Minitube of America filed its complaint in this case on June 14, 2013. (Docket #1). In its complaint, Minitube of America asserts the following six claims against Minitüb Germany:

(1) *infringement of the '503 patent*, based upon Reproduction Provisions' alleged sale, offer for sale, or importation of US BAGs from Minitüb Germany (Compl. ¶¶ 38–43);

(2) *false patent marking*, based upon Minitüb Germany having listed the '503 patent's registration number on the versions of the US BAG it produced and shipped to the United States (Compl. ¶¶ 44–48);

(3) *trademark infringement*, based upon the defendants' allegedly unauthorized use of Minitube of America's trademarks (Compl. ¶¶ 49–54);

(4) *false advertising under the Lanham Act*, based upon defendants' alleged representations that the Minitüb Germany-produced US BAGs are superior to those produced by Minitube of America, in conjunction with Minitüb Germany's use of similar or the same trademarks as those used by Minitube of America (Compl. ¶¶ 55–63);

(5) *fraudulent misrepresentations under Wis. Stat. § 100.18*, based upon alleged misrepresentations to customers about the companies' products (Compl. ¶¶ 64–68); and

(6) *unfair competition*, based upon the entirety of the defendants' activities (Compl. ¶¶ 69–71).

Minitube of America seeks: monetary and punitive damages; injunctive relief enjoining Minitüb Germany from continuing its current course of conduct; and attorneys' fees. (Compl. ¶¶ 72–77).

The defendants answered Minitube of America's complaint, and further asserted a number of counterclaims stemming from the same core set of events that Minitube of America based its complaint upon. (Docket #16). Specifically, the defendants allege the following five counterclaims:

(1) *a claim for injunctive relief* declaring that the defendants have not infringed the '503 patent (Am. Answer and Counterclaim ¶¶ 41–47);

(2) *misappropriation of trade secrets*, based upon Minitube of America's alleged receipt and later disclosure of proprietary business information (Am. Answer and Counterclaim ¶¶ 48–60);

(3) *breach of contract*, based upon Minitube of America's disclosure of confidential business information to third parties in violation of alleged confidentiality agreements (Am. Answer and Counterclaim ¶¶ 61–67);

(4) *trademark infringement*, based upon Minitube of America's alleged use of the ANDROSTAR and ANDROCOLL trademarks (Am. Answer and Counterclaim ¶¶ 68–78); and

(5) *tortious interference with contract*, based upon: Minitube of America's cease and desist letter to Reproduction Provisions; petition to cancel the ANDROSTAR mark; misappropriation of trade secrets; and petition to the U.S. Patent and Trademark Office to change the ownership of a pending patent application (Am. Answer and Counterclaim ¶¶ 79–92).

The defendants seek a declaration that they have not infringed the '503 patent; monetary damages; and attorneys fees. (Am. Answer and Counterclaim at 25–26).

2. DISCUSSION

Having set forth the totality of the claims being asserted by the parties in this action, the Court now turns to address the pending motions for summary judgment.

2.1 Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## 2.2    Substantive Analysis of Claims

The Court now turns to its substantive analysis of the summary judgment motions. It will analyze each of the parties' claims, but first must address the defendants' argument that Minitube of America lacks standing to sustain its claims or the right to seek injunctive relief in this case.

### 2.2.1    Minitube of America's Standing and Right to Seek Relief

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Its basic elements are: (1) that the plaintiff alleges an injury-in-fact; (2) the injury is fairly traceable to the defendant's unlawful conduct; and (3) the injury is likely to be redressed by the relief the plaintiff seeks. *Lujan*, 504 U.S. at 560–61; *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)). Meanwhile, to be entitled to injunctive relief, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–312 (1982)). In *eBay, Inc. v. MercExchange, LLC*, the Supreme Court made clear that this test applies in the patent context. 547 U.S. 388 (2006).

The defendants make a number of arguments regarding standing and Minitube of America's right to seek relief, but never seem to hit upon a crisp statement that fully encapsulates what they are trying to get across. Minitube of America, in turn, has difficulty responding.

Here is what the Court understands the defendants to be arguing:

(1)     Minitube of America has not alleged past monetary injury; therefore, it cannot establish that it has suffered an injury in fact, in satisfaction of the first element of the standing test; and, consequently, it allegedly lacks standing to pursue *monetary damages*;

(2)     Minitube of America relinquished its patent and trademark rights to a third party; therefore, it cannot establish that Minitube of America, itself, will suffer any future injury; accordingly, it has either failed to establish that it has suffered an injury in fact in this regard or that it has suffered an injury likely to be redressed by injunctive relief, thus failing to satisfy either the first or third element of the standing test; and, consequently, it allegedly lacks standing to pursue *injunctive relief*; and

(3)     Even if Minitube of America has standing to pursue injunctive relief, it cannot possibly be entitled to that relief, because it has assigned away its patent and trademark rights, and therefore cannot establish that it would be irreparably injured in the absence of an injunction, as required to satisfy the first element of the injunction test.

The defendants jumble the first two of those issues together in their briefs, which only confuses matters. (Docket #57, 5–8). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute *or of particular issues*." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (emphasis added). In other words, a party's standing to seek relief may vary issue-by-issue; standing is evaluated on a claim-by-claim basis. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("our standing

cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press.").

That is particularly important to remember here because the standing analysis changes with the type of relief sought. Minitube of America's assignment of its patent and trademark rights has very little to do with its entitlement to redress for past monetary injury.[13] Likewise, the existence or non-existence of past damages does very little to establish that Minitube of America should be entitled to an injunction going forward.[14] *See, e.g.*, *Winter*, 555 U.S. at 20 (plaintiff must show "that he is likely *to suffer* harm." (emphasis added)).

As to that last point, Minitube of America's right to seek injunctive relief, under the tests described in *Winter*, *eBay*, and other injunctive-relief cases, plays a direct role in the Court's analysis of Minitube of America's standing to seek injunctive relief. While the two analyses—standing and right to injunctive relief—are distinct, a party's right to injunctive relief certainly affects the third element of the standing test: redressability.

Thus, the Court first analyzes Minitube of America's standing to seek monetary damages on its claims, and thereafter addresses its ability to seek injunctive relief.

---

[13]For instance, if an owner of a rental house sues a former tenant for damages to that house, he does not lose his claim for relief by selling the house while the case is pending.

[14]To play off the prior example, the owner of that rental house should not be entitled to an injunction prohibiting his former tenant from entering the rental house if he no longer owns the rental house. Because he no longer owns the house, the former owner either: (1) cannot be said to suffer an injury in fact, as he has no stake in the upkeep of the house once he has relinquished ownership; or (2) would not have any injury redressed by an injunction, because an injunction would only address future injury, which he cannot suffer, as he has relinquished ownership.

### 2.2.1.1   Standing to Seek Monetary Relief

The defendants argue that Minitube of America lacks standing to pursue monetary relief because it alleges no past monetary injury and thus asserts no injury in fact. (Docket #57, 5).

The Court disagrees with the defendants' position. To begin, Minitube of America makes clear that it is asserting claims that it believes entitle it to monetary damages. (Docket #67, at 3 (citing PPFF ¶¶ 63, 69, 77–78, 81–83)). Minitube of America is correct. In the paragraphs it cites, it points to alleged past violations of patent and trademark laws by the defendants. (*See* PPFF ¶¶ 63, 69, 77–78, 81–83).

Minitube of America is the proper party to assert those claims. *See, e.g.*, *Moore v. Marsh*, 74 U.S. 515, 522 (1869) ("right of action is given to the person or persons owning the exclusive right [to the patent] at the time the infringement is committed"); *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 40 (1923); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991). "Assignment or termination of the proprietary interest in the patents-in-suit does not abrogate this right of action unless it is also accompanied by an explicit assignment of all causes of actions, including the right to sue for past infringement." *Alloc, Inc. v. Pergo, Inc.*, 572 F. Supp. 2d 1024, 1028 (E.D. Wis. 2008) (citing *Schreiber Foods v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202–03 (Fed. Cir. 2005)).

Moreover, if Minitube of America can prove up its patent and trademark infringement cases, then it will be entitled to receive damages; Minitube of America maintains that it has suffered damages, and certainly—if nothing else—its corner on the American market may have been reduced by the defendants' infringing activities leading to a reduction in

value. There is other evidence of damages: despite having purchased Minitube of America-produced US BAGs for several years, Reproduction Provisions has now entirely stopped such purchases. (PPFF ¶¶ 63–64); Minitube of America has also—at least temporarily—discontinued or rebranded some of its products while this case has been pending (DPFF ¶ 49 and Resp.), which certainly entails costs.[15]

Because Minitube of America is the appropriate party to seek monetary damages and has asserted facts that would support such an award, the Court finds that Minitube of America has standing to prosecute those claims.

### 2.2.1.2   Injunctive Relief Standing

On the other hand, Minitube of America runs into problems right out of the gate on its request for injunctive relief. "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499–500 (citing *Tileston v. Ullman*, 318 U.S. 44 (1943); *United States v. Raines*, 362 U.S. 17 (1970); *Barrows v. Jackson*, 346 U.S. 249 (1953)).

Minitube of America has relinquished its legal rights in favor of Cooperative Resources, and therefore is no longer asserting its "own legal rights and interests," insofar as it seeks injunctive relief. Minitube of America has no legal interest in its own patents and trademarks: it has fully licensed them to Cooperative Resources for the pendency of this suit (*see, e.g.*, Docket

---

[15]Of course, at trial, it will be Minitube of America's burden to prove up any of these damages, which may not be very substantial.

#64, Ex. AA, ¶¶ 1.11, 2.1, 3.1; Ex. TT ¶ 2.3(k) and Sch. 2.3(k)) and agreed to convey the entirety of its remaining rights to a Cooperative Resources-owned entity immediately upon the outcome of this suit (SF ¶ 50). Thus, it simply is not the right party to seek injunctive relief.

Minitube of America, itself, would not suffer any injury-in-fact if the defendants use its intellectual property—rather, Cooperative Resources would suffer that injury. Likewise, because Minitube of America would suffer no injury, any injunctive relief that this Court may issue could not redress its injury. Finally, because Minitube of America would suffer no injury if the defendants were to continue using its intellectual property, it cannot establish that it is likely to "suffer irreparable harm." *E.g., Winter*, 555 U.S. at 20. Thus, it cannot satisfy the test for an injunction; the Court, in turn, cannot grant it the redress it seeks.

For these reasons, the Court is obliged to hold that, in its claim for injunctive relief, Minitube of America cannot satisfy the first or third elements of the standing test. Accordingly, Minitube of America lacks standing to maintain its claims for injunctive relief, and the Court must grant the defendants' motion for summary judgment in that regard.

Nonetheless, having determined that Minitube of America has standing to seek monetary damages, the Court must still address the defendants' motions for summary judgment on Minitube of America's claims for monetary relief. Accordingly, the Court still must analyze all of the parties' substantive claims to determine whether any are appropriately dismissed at this summary judgment stage.

### 2.2.2 Patent Infringement Claims

Minitube of America's and the defendants' respective first claims are mirror images of one another: Minitube of America seeks a finding that the defendants have infringed the '503 patent, whereas the defendants seek a declaratory judgment holding the opposite. (*E.g.* Compl. ¶¶ 38–43; Am. Answer and Counterclaim ¶¶ 41–47). The Court, therefore, addresses them simultaneously.

Doing so, the Court begins by describing what is *not* at issue. First, the parties agree that the validity of the '503 patent is not at issue. (PPFF ¶ 66 and Resp.; Docket #102). Likewise, claim construction and literal infringement is not an issue, because the defendants acknowledge that the Minitüb Germany-manufactured US BAGs practice the claims of the '503 patent. (PPFF ¶¶ 67, 72 and Resp.; Docket #102).

Thus, the single, broad question remaining on the patent issue is whether the defendants have violated the terms of 35 U.S.C. § 271(a): "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

Answering that question is not simple, though. It first requires an analysis of whether, over the course of the companies' informal relationship, Minitüb Germany may have received some form of license from Minitube of America to use the '503 patent. If that is the case, then Minitüb Germany could not be said to be "without authority," as is required to satisfy the terms of 35 U.S.C. § 271. On the other hand, if there was no license or agreement, then the Court must examine the defendants' Expo-related activities—

displaying and distributing Minitüb Germany-manufactured US BAGs at the Expo—to determine whether they satisfy 35 U.S.C. § 271(a)'s prohibition on making, using, selling, or offering to sell the product in the United States. Likewise, the Court must determine whether there is enough evidence to conclude that the defendants imported (or did not import) 20,000 US BAGs into the country, which would also violate the terms of 35 U.S.C. § 271(a).

### 2.2.2.1 Existence of Agreement or License

The defendants' primary argument in support of its contention that it did not infringe the '503 patent is that they had a license to produce, import, and sell products covered by the '503 patent. (Docket #57, at 9–12).

Issues of patent ownership and assignment are state law matters, and therefore the Court must look to Wisconsin law to determine whether the defendants had a license, as they contend. *See, e.g.*, *Beriont v. GTE Labs., Inc.*, 535 Fed. App'x 919, 926-27 (Fed. Cir. 2013) (citing *Enovys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1342 (Fed. Cir. 2010); *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1327 (Fed. Cir. 2009); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1577 (Fed. Cir. 1997)).

The parties never entered into any written agreement with one another that would govern the patent-licensing issue. Thus, the question is whether, over the course of the long relationship between Minitüb Germany and Minitube of America, an implied contract arose, under which the defendants received a license to produce and sell products covered by the '503 patent in the United States.

The defendants are correct that contracts may arise orally or through an implied meeting of the minds. (Docket #57, 9 (citing *Cal. Wine Ass'n v. Wis. Liquor Co. of Oshkosh*, 20 Wis. 2d 110, 122, 121 N.W.2d 308 (1963); *Theuerkauf*

*v. Sutton*, 102 Wis. 2d 176, 184–85, 306 N.W.2d 651 (1981))). So, if, over the course of the parties' relationships, Minitube of America—the owner of the '503 patent—agreed that the defendants could produce or sell covered products in the United States, then some or all of the defendants would have had the authority to do so, and therefore would not violate 35 U.S.C. § 271(a) in doing so.

No such agreements exist here. Certainly, Reproduction Provisions never received a license from Minitube of America, who actually obtained a still-effective judgment prohibiting Reproduction Provisions from infringing the '503 patent. But even Minitüb Germany never received the license necessary to be entitled to produce and sell products covered by the '503 patent *in the United States.* Without a doubt, it is strange that Christian, a co-inventor of the '503 patent, assigned all of his rights in the patent to Minitube of America, receiving nothing in return. But, after he did so, Minitüb Germany never attempted to enter the North American market with products covered by the patent. Rather, Minitüb Germany marketed those products throughout the rest of the world, leaving the North American market alone. Indeed, it was not until after Minitube of America's rejection of Minitüb Germany's efforts to acquire it that Minitüb Germany ever asserted the right to act in the United States market; that action was followed quickly by a cease and desist letter. Simply put, there is nothing in the record to support the existence of an implied U.S. license granted from Minitube of America to Minitüb Germany. The parties' course of conduct shows conclusively that they never agreed that Minitüb Germany should be granted a license to sell or produce products that would be covered by the '503 patent

in the United States.[16] Thus, the Court is obliged to conclude that no license existed.

### 2.2.2.2    Sale, Offer, or Importation

Because the defendants did not have a license to produce or sell '503-covered products in the United States, the next question is whether the defendants took some action that could be deemed infringement: production, use, sales, or offers of covered products in the United States or importation of covered products into the United States. *See* 35 U.S.C. § 271(a).

The parties seem to agree that there has not been production or use of the products in the United States. (*See* Docket #67, at 14–19 (discussing only sale, offer to sell, and importation)). Thus, there are two questions that the Court must answer: (1) whether the defendants offered to sell infringing products by distributing samples at the Expo; and (2) whether the defendants sold or imported infringing products when they agreed to import 20,000 US BAGs, which were possibly diverted to Mexico.

### 2.2.2.2.1    Offer for Sale at Expo

"An 'offer for sale' sufficient to give rise to liability for patent infringement must meet the traditional contract law definition of that term." *Superior Indus., LLC v. Thor Global Enterprises Ltd.*, 700 F.3d 1287, 1294 (Fed. Cir. 2012) (citing *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1255 (Fed. Cir. 2000)). To determine whether an action constitutes an offer, the Court applies general contract law—including the Uniform Commercial Code ("the UCC"), the *Restatement (Second) of Contracts, Corbin on Contracts,* and federal

---

[16]Instead, the only logical interpretation of any implied agreement is that the parties agreed that they would divide up the world market: Minitube of America in North America and Minitüb Germany throughout the rest of the world.

case law on the topic. *See, e.g., Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.,* 322 F.3d 1335, 1347-48 (Fed. Cir.2003); *Group One*, 254 F.3d at 1048. Those sources provide myriad ways to look for an offer.

The *Restatement (Second) of Contracts* defines an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement (Second) of Contracts* § 24.

Meanwhile, the Federal Circuit has made clear that the language used by the parties in communicating with one another is one of the prime factors in determining whether the requisite manifestation of intent exists. The Federal Circuit states that "[l]anguage suggesting a legal offer, such as 'I offer' or 'I promise' can be contrasted with language suggesting more preliminary negotiations, such as 'I quote' or 'are you interested.' Differing phrases are evidence of differing intent, but no one phrase is necessarily controlling." *Group One,* 254 F.3d at 1048. But language, alone, is not entirely dispositive, according to the Federal Circuit. Instead, the Court must also look to the circumstances surrounding the communication, such as any prior dealings between the parties, whether their communications were private or public, whether their communication occurred in reply to a request for an offer, and the detail in the terms of the communications. *See, e.g., Fisher-Price, Inc. v. Safety 1st, Inc.,* 109 Fed. App'x 387, 392 (Fed. Cir. 2004) (citing 1 *Corbin on Contracts* § 2.2 at pp. 1-2 (Joseph M. Perillo, Rev. ed. 1993); *Restatement (Second) of Contracts* § 26, cmt. c (1981)). This requires that the defendant manifest its willingness to enter an agreement that would justify a recipient to determine that his acceptance of terms offered would conclude the agreement. *Superior Indus.,* 700 F.3d at 1294 (citing *MEMC Elec. Materials, Inc.*

*v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005)). Accordingly, where communications from the defendant do not contain price terms or other specifics required for a firm offer, the defendant's communications cannot be termed an offer for sale, because the recipient could not make a binding contract by accepting the terms. *Superior Indus.*, 700 F.3d at 1294 (citing *MEMC*, 420 F.3d at 1376).

Finally, it is very important to note that acceptance of an offer is not required. "Rather, the focus of the inquiry is whether the offer *could have been made* into a binding contract by formal acceptance." *E.g. Scaltech*, 269 F.3d at 1328–1329; *Honeywell Int'l Inc. v. Nikon Corp.*, 672 F. Supp. 2d 638, 644 (D. Del. 2009) *aff'd sub nom. Honeywell Int'l, Inc. v. Nokia Corp.*, 400 Fed. App'x 557 (Fed. Cir. 2010).

At this point, the state of the record is not clear enough to grant either party summary judgment on the issue. As is apparent from the law cited above, the existence of an offer is a complex and fact-bound determination, and the facts simply are not as clear cut as either party represents to the Court.

Minitube of America's strongest argument in favor of the existence of an offer is that the defendants "handed out samples of the Minitüb US BAG, a price list with a price for the Minitüb US BAG (among other MTI products RP was also offering to sell) and an MTI catalog containing the Minitüb US BAG." Unfortunately, Minitube of America does not cite to the exact evidence to prove up that claim (the Court assumes it appears at Docket #38, Ex. C). Nor does either party discuss in any detail that evidence, the method by which it was obtained, or the communications that took place between the defendants' representatives and potential customers at the Expo.

To be clear, Minitube of America obtained the price list by sending a representative, Steve Tardif, to the Expo. (*See, e.g.*, DPFF ¶ 26; Resp. to PPFF ¶ 51). There, Mr. Tardif posed as a buyer from Canada and obtained promotional materials from the defendants' booth. (Docket #37, #38). One piece of those materials was a news release and price list for Minitüb Germany products being sold by Reproduction Provisions (Docket #38, Ex. C).

Minitube of America seems to believe that this price list alone is enough to establish the existence of an offer. (Docket #67, 17). It is not. To begin, the news release accompanying the price list states that "[w]e *will* inventory products in our warehouse in Walworth, WI so that we can readily ship orders out daily. Our company *will* also represent Minitube International AG, Germany at various industry trade shows and exhibits throughout the year." (Docket #38, Ex. C (emphasis added)). That language, speaking as it does of a future course of action, seems to weigh against the existence of an offer. If the price list were meant as a demonstration of Reproduction Provisions' *plans* to offer Minitüb German products *in the future*, then it could not be an offer, because customers could not have accepted the sale on the spot.

That uncertainty in the purpose of the price list makes the communications between Reproduction Provisions' booth representatives and Mr. Tardif all the more important.[17] If the representatives told him that

---

[17]The Court makes no finding, at this time, as to whether Mr. Tardif's testimony will even be admissible. If nothing else, given his allegedly dishonest methods for obtaining information, Mr. Tardif will likely be subject to significant impeachment upon cross-examination. All of this, however, may be a matter for motions *in limine* prior to trial.

the price list was tentative and intended for demonstration purposes only, then the forward-looking language makes a good deal more sense: Reproduction Provisions meant it only as forward-looking estimates about what Reproduction Provisions planned to offer. In that case, it could not have been a formal offer, because interested parties could not have accepted it and made a formally binding contract. If, on the other hand, the representatives explained that products were, for example, stocked and ready to ship or currently being imported and ready for shipment soon, then there likely was an offer for sale. Finally, if the representatives did not distribute the price list—perhaps Mr. Tardif obtained it through unauthorized means or by badgering the representatives until they provided it to him, when they did not provide it to anyone else—then there likely was not an offer for sale. Any of these occurrences is a distinct possibility.

Other evidence is also important. The shipping, return, and payment terms on the first page of the price list certainly weigh in favor of the existence of an offer. On the other hand, the notice that "[p]rices subject to change without notice," shows that the price list may have been meant as a mere ballpark estimate of final prices; if Reproduction Provisions or industry practice was such that prices changed regularly and without warning, then the list would not even technically have provided *prices*, because a buyer would have to call for a final price before being allowed to create a binding contract (in this case, the price list would operate more as an invitation for an offer).

There is simply too much at play, here—particularly in light of the lack of clarity about Mr. Tardif's encounters with Reproduction Provisions' representatives—for the Court to decide the matter at this stage. The Court,

therefore, must deny both parties' motions for summary judgment on this issue.[18]

### 2.2.2.2.2   Importation

Whoever, without authorization, "imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). However, as the defendants correctly point out, 35 U.S.C. § 271(a) only reaches activities that occur in the United States. (Docket #57, 15 (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1313 (Fed. Cir. 2005))). So, if an individual were to ship a patented invention from Germany directly to Mexico, that party could not be held liable for a violation of 35 U.S.C. § 271(a), because—even if the product itself literally infringed the patent—the importation did not occur in the United States. *See* 35 U.S.C. § 271(a). Likewise, only the party who *actually* imported the product can be held liable for infringement. *See, e.g.*, *Cybiotronics, Ltd. v. Golden Source Electronics, Ltd.*, 130 F. Supp. 2d 1152, 1174–75 (citing *Pfizer, Inc. v. Aceto Corp.*, 853 F. Supp. 104 (S.D.N.Y. 1994); *Tec Air, Inc. v. Nippondenso Mfg. U.S.*, 1997 WL 49300, at *3–*4 (N.D. Il. 1997); H.R. Rep. No. 60, 100th Cong. 1st Sess. 6; S. Rep. No. 83, 100th Cong., 1st Sess. 48); *Fellowes, Inc. v. Michilin Prosperity Co., Ltd.*, 583–84 (E.D. Va. 2007) (citing *Cybiotronics*, 130 F. Supp. 2d at 1174; *NTP*, 418 F.3d at 1314–15).

---

[18]The Court is satisfied, however, that Minitüb Germany's close interrelation with Reproduction Provisions—culminating in a distribution agreement, press release, and provision of promotional materials shortly before the Expo—establishes clearly that Minitüb Germany: (1) knowingly induced Reproduction Provisions' alleged offer for sale; and (2) possessed the specific intent to encourage that offer, such that it can be held liable for inducement under 35 U.S.C. § 271(b), if there was, in fact, an offer for sale. *See ACCO Brands, Inc. v. ABA Locks Mfr. Co. Ltd.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007).

There are, thus, two questions to answer on this issue. First, were any of the products even brought into the United States? If not, then the parties could not possibly have violated 35 U.S.C. § 271(a)'s ban on unauthorized importation. If so, then the Court must answer the second question: which party *actually* imported the products into the United States?

The Court lacks sufficient evidence to determine the answer to the first question. The defendants assert that, while the 20,000 US BAGs were in transit from Germany to the United States, they had the shipper "remove the US BAG order from the shipping container and send it to Mexico." (Docket #78, 14 (citing DPFF ¶ 44)). Unfortunately, the defendants have not provided any definite evidence—tracking numbers, shipment information, etc.—to support that assertion, and so the Court cannot grant it summary judgment on the importation issue.

Minitube of America disagrees with the defendants' assertion that the US BAGs never arrived in the United States, but certainly does not make a cogent case for its disagreement. (*See* Docket #87, 4; Resp. to DPFF ¶ 44). To begin, in its response to the defendants' forty-fourth proposed finding of fact, Minitube of America asserts that the US BAGs actually *did* arrive in America, and were shipped to Texas then on to Mexico. (Resp. to DPFF ¶ 44). Minitube has absolutely no shipping information to support its disagreement. Instead, it relies solely on a very unclear statement in the deposition of Rick Schoenbeck. (*See* Resp. to DPFF ¶ 44 (citing Schoenbeck Dep. (Docket #59), 77:1–79:20)). In fact, Mr. Schoenbeck's statement casts Minitube of America's position into doubt: after expressing much uncertainty about where the US BAGs were shipped, noting only that they never arrived at Reproduction Provisions, Mr. Schoenbeck only states that to "[t]he best of our knowledge

they went to Texas and on to Mexico, but I don't have any tracking numbers or solid information." (Schoenbeck Dep. 77:1–79:2). Seeing as Mr. Schoenbeck did not work for the shipper and lacked any supporting information, the "best of [his] knowledge" is practically none at all. It is not enough to support Minitube of America's position that the US BAGs arrived in Texas. Additionally, Minitube of America casts its position further into doubt by making a conflicting representation in its reply brief in support of its motion for summary judgment. There, Minitube of America represents that "the shipment of infringing products was imported into the United States and then eventually diverted to Germany." (Docket #87, 8). That statement is not specific as to where the US BAGs arrived in the United States, and also conflicts with Minitube of America's other position, claiming that the US BAGs eventually were transferred to Mexico. In sum, there is not enough evidence to support Minitube of America's motion for summary judgment on the importation of the 20,000 US BAGs.

Whether the shipment of those 20,000 US BAGs can give rise to infringement for importation, pursuant to 35 U.S.C. § 271(a), is a question that must go to trial.

If Minitube of America can establish, however, that the bags did arrive in the United States, then the Court finds that all three of the defendants may be held liable under 35 U.S.C. § 271. Reproduction Provisions would be liable as the importer, under 35 U.S.C. § 271(a), because it was the recipient of the 20,000 imported US BAGs from the third party. Minitüb Germany, on the other hand, was at most the exporter of the goods (even that is somewhat in question, as it contracted with a third party exporter to ship the goods to the United States). The Court, however, finds that, if there was infringement by

Reproduction Provisions' importation, Minitüb Germany (and MTI by extension) would be liable for inducement, under 35 U.S.C. § 271(b), given its close distribution relationship with Reproduction Provisions. To allow Minitüb Germany off the hook because it is *technically* only an exporter makes little sense because Minitüb Germany actively contracted with an American company to be its United States distributor, despite having full knowledge of the potentially-infringing nature of its products. It had the specific intent to enter the United States market to compete with the patent-owner, Minitube of America, selling precisely the same product. This shows that Minitüb Germany knowingly induced the importation with the intent to infringe the '503 patent. establishing that it may be held liable for inducement. *E.g.,* 35 U.S.C. § 271(b); *ACCO Brands*, 501 F.3d at 1312.

One additional issue remains on the topic of importation: whether the defendants should be held liable at this stage for importation of the 40 sample US BAGs that were distributed at the Expo. The Court finds that summary judgment is not appropriate on this issue at this stage. Without a doubt, those 40 samples *had to* be imported to the United States by someone at some point. Otherwise, how would they have arrived here from Germany? But the Court cannot grant summary judgment on this point, because the parties have neither briefed the issue nor provided substantial evidence regarding the importation of the items into the United States.[19]

---

[19]Paragraphs 24 and 25 of the Defendants' Proposed Findings of Fact make clear that Reproduction Provisions received 100 sample US BAGs prior to the Expo, but the parties have not provided any specific information about that receipt (or the shipment to Reproduction Provisions). This leaves open the question of whether Reproduction Provisions (or some other party or third party) "imported" the bags and whether Minitüb Germany can be said to have induced such importation.

Accordingly, the Court denies both parties' motions for summary judgment on the issue of infringement by importation.

### 2.2.2.3    *De Minimis Non Curat Lex*

The final argument the Court must address on the patent infringement issue is whether the defendants' actions were so minor that they should not be held liable for patent infringement, under the common law doctrine of *de minimis non curat lex.* (Docket #57, 14–15 (citing *Collins & Aikman Corp. v. Stratton Indus., Inc.*, 728 F. Supp. 1570, 1578 (N.D. Ga. 1989); *Medtronic Vascular, Inc. v. Boston Scientific Corp.*, 348 F. Supp. 2d 316, 322 (D. Del. 2004); *Baxter Diagnostics, Inc. v. AVL Scientific Corp.*, 798 F. Supp. 612, 629 (C.D. Cal. 1992); *Pfizer, Inc. v. Int'l Rectified Corp.*, 217 U.S.P.Q. 157, 158 (C.D. Cal. 1982))).

The defendants do not qualify for application of that doctrine because any alleged infringement was commercial and not extremely limited. Minitube of America correctly points out that the doctrine is generally applied only in non-commercial contexts. (Docket #67 at 19–20 (citing *Baxter*, 798 F. Supp. at 620; *Pfizer*, 217 U.S.P.Q. at 158)).[20] Seeing as all of the defendants' activities were directed to commercial ends—alleged offers for sale at the Expo and alleged importation for eventual sale—the Court simply cannot employ the doctrine, here.

---

[20]The defendants seem to acknowledge as much, stating that "[i]n the importation context, the doctrine applies where the acts of infringement are not committed in furtherance of some commercial purpose." (Docket #57 at 14 (citing *Medtronic Vascular*, 348 F. Supp. 2d at 322; *Baxter*, 798 F. Supp. at 629)). Restating that language to avoid the confusing use of the negative, the Court points out that the defendants essentially acknowledge that the doctrine *does not* apply when the infringement occurs to further some commercial purpose.

### 2.2.3 False Patent Marking Claim Against the Defendants

Under 35 U.S.C. § 292, Minitube of America may recover damages from the defendants by showing that the defendants, (1) without consent, (2) marked a product offered for sale in the United States or imported into the United States with the '503 patent number or the name or mark of Minitube of America (3) with the intent of imitating Minitube of America's '503 patent or deceiving the public (4) such that Minitube of America "suffered a competitive injury." 35 U.S.C. § 292(a–b). In *In re BP Lubricants USA, Inc.*, the Federal Circuit made clear that parties seeking relief under 35 U.S.C. § 292 must state their claims with particularity under the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure because false patent marking under 35 U.S.C. § 292 is a form of fraud. 637 F.3d 1307, 1310–11 (Fed. Cir. 2011). To satisfy the particularity requirements of Rule 9(b), the "pleading must identify the specific who, what, when, where, and how," of the false patent marking claim. *See, e.g.*, *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1318 (Fed. Cir. 2009) (discussing Rule 9(b) standard in light of inequitable conduct claim); *In re BP*, 637 F.3d at 1311 ("*Exergen*'s pleading requirements apply to all claims under Rule 9(b), not just inequitable conduct cases.").

The defendants argue that Minitube of America's complaint did not state the elements of its false patent marking claim with the requisite particularity (Docket #57 at 16–18) and, further, that—even if its complaint was sufficient—Minitube of America cannot establish its false patent marking claim (Docket #57 at 19–20). Minitube of America responds, arguing that the defendants waived their particularity argument by not raising it sooner (Docket #67 at 20–21), that it complied with Rule 9(b)'s particularity

requirements (Docket #67 at 21–22), and that its evidence can establish a false patent marking claim. (Docket #67 at 21–22).

The Court will ignore Minitube of America's waiver argument, because it finds that Minitube of America's complaint satisfies Rule 9(b)'s particularity requirements. Minitube of America's complaint alleges that Minitüb Germany and Reproduction Provisions (the "who") marked with the '503 patent and offered for sale Minitüb Germany-produced US BAGs knowing that Minitüb Germany did not own the '503 patent and without consent to do so (the "what" and "how") at the June 5, 2013, through June 7, 2013, Expo in Des Moines, Iowa (the "when" and "where"). (Compl. ¶¶ 6–7, 9, 20–22, 26–27, 46–47). This satisfies Rule 9(b)'s particularity requirements. *E.g.*, *In re BP*, 637 F.3d at 1310–12.[21]

Minitube of America can also show that the defendants are liable for false patent marking. The defendants argue that Minitube of America cannot succeed on this claim because: (1) the US BAGs were made five or more years ago, at a time when Minitüb Germany had the authority to mark them with the '503 patent's registration number; and (2) that Minitube of America has no evidence of the defendants' intent. (Docket #57 at 19–20; Docket #96 at 14). Both of those contentions are incorrect.

As to the first contention, the defendants do not cite any evidence that actually supports it. (*See* Docket #57 at 19 (citing DPFF ¶¶ 24–25)). The proposed findings it cites instead relate only to the distribution of the

---

[21] Moreover, even if it did not satisfy the particularity requirement, the Court would grant Minitube of America leave to amend its complaint to add particularity, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, because justice so requires. Despite the nearness to trial, had the defendants raised this objection to the complaint in a more timely fashion, Minitube of America would have had ample opportunity to amend its complaint.

samples—not at all to when the samples were produced or whether Minitüb Germany had authority to mark them at that time. (DPFF ¶¶ 24–25). Without evidence on the fact from either party, the Court cannot enter summary judgment on the basis that the products were produced at a time when authorization existed.

The second contention also does not support summary judgment. The Court must credit all of Minitube of America's evidence and draw all justifiable inferences in its favor. *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1344 (Fed. Cir. 2013). Doing so, the Court must conclude that there is at least ample evidence for Minitube of America to escape summary judgment: the defendants were fully aware that Minitube of America is the sole owner of the '503 patent; they were also aware that Minitube of America had recently opted not to merge with Minitüb Germany, and still intended to continue marketing its US BAG product in America; and, despite that knowledge, the defendants marketed practically-identical US BAGs for sale to the public. From that information, it would be reasonable to infer that the defendants had the requisite intent, and the Court, therefore, may not grant summary judgment in the defendants' favor on this issue.

Perhaps Minitube of America will not be able to carry its burden to show intent at trial. Perhaps the defendants will establish that the products in question were marked at a time when authorization existed. But, at this juncture, the Court cannot award summary judgment on either basis.

### 2.2.4   Trademark Infringement Claims

Both parties assert trademark infringement claims against one another. The Court addresses them separately, as follows.

### 2.2.4.1    Minitube of America's Infringement Claim Against the Defendants

With reference to Minitube of America's trademark infringement claims against the defendants, the parties have filed cross-motions for summary judgment. That is, the defendants argue that the Court must dismiss Minitube of America's patent infringement claims, while Minitube of America argues that it is entitled to judgment that the defendants infringed its trademarks and that such infringement was willful.

The Court addresses the defendants' motion first. Then, because it finds that it must deny the defendants' motion, it addresses Minitube of America's motion.

### 2.2.4.1.1    Defendants' Motion

Under 15 U.S.C. § 1127, a mark is abandoned when "its use has been discontinued with intent not to resume such use." The Court must look to the circumstances to determine whether Minitube of America has the intent not to resume use. 15 U.S.C. § 1127.

The defendants' sole argument in support of their motion for summary judgment on Minitube of America's trademark infringement claims is that Minitube of America abandoned its trademarks. It bases that argument on two assertions: first, that Ludwig Simmet admitted that the company was ceasing use of the marks in question; second, that Minitube of America sold its assets to Cooperative Resources and entered into the License and Assignment agreement. (Docket #57 at 20; Docket #96 at 12–13).

Objecting to the defendants' first assertion, Minitube of America argues that, even if it has discontinued the use of the marks in question, it did not do so with "intent not to resume" using them. (Docket #67 at 22–24). The Court agrees. Ludwig Simmet acknowledged temporary discontinuation of

certain marks (Docket #64, Ex. H, at 197–98, 205–06, 233), but maintains that is solely to avoid confusion caused by the defendants' infringement and that he intends to resume use. (Docket #64, Ex. H, at 198:2–199:10 ("we chose not to use that name *for right now*" (emphasis added)); Docket #72, ¶¶ 14–18).[22] Given that Minitube of America's discontinuation of use of its marks is only temporary, the Court cannot conclude that it has an "intent not to resume" its use, and therefore Ludwig Simmet's statement cannot form the basis for a finding of abandonment.

The defendants' second assertion—that Minitube of America abandoned its marks by licensing and agreeing to transfer them to Cooperative Resources—is a much closer call, but again Minitube of America prevails. To begin, Minitube of America's current license to Cooperative Resources does not establish abandonment. Where a trademark owner provides a "naked license" of its mark—that is, where it allows a licensee to use a mark "without 'exercising reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee'"—it has abandoned that mark. *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 639 F.3d 788, 789–90 (7th Cir. 2011) (quoting *Restatement*

---

[22]The defendants argue that the Court may not credit Ludwig Simmet's second declaration (Docket #72), because it is "self-serving, eleventh-hour, contradictory…testimony." (Docket #96 at 12 (citing *Vandeveer v. Fort James Corp.*, 192 F. Supp. 2d 918, 921 (E.D. Wis. 2002); Fed. R. Civ. P. 56(c)–(e); Fed. R. Ev. 402, 602)). To be sure, the Court must strike affidavit testimony not based on personal knowledge and conclusory self-serving statements. *Vandeveer*, 192 F. Supp. 2d at 921 (citing *Albiero v. City of Kankakee*, 246 F.3d 923, 933 (7th Cir. 2001); Fed. R. Civ. P. 56(e)). But neither of those is the case, here. Ludwig Simmet's declaration was made on personal knowledge, as he knows Minitube of America's business plans. Moreover, while his declaration may be self-serving, it is not conclusory—it actually comports with his prior statement that the company does not use the name "*for right now.*"

*(Third) of Unfair Competition*, § 33 (1995); citing *Restatement (Third) of Unfair Competition* § 30; *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885–87 (7th Cir. 1997)). But, that is not what occurred here. In fact, under the terms of the license agreement, Minitube of America and Cooperative Resources agreed to the following terms regarding quality control:

> Licensee agrees to make full and proper use of the Licensed Trademarks and to endeavor to increase the reputation and goodwill of the Licensed Trademarks. To control the quality of any goods or services sold or offered for sale by Licensee bearing the Licensed Trademarks, Licensor will have the right to inspect, for quality control, all future advertisements, packaging, labeling, and the products, as set forth herein. Licensor shall have the right to inspect the labels, packaging, and advertising of Licensee and its sublicensees on an annual basis. Licensor retains the right to approve in advance any material changes to the use by Licensee or its sublicensees of the Licensed Trademarks.

(Docket #64, Ex. AA, ¶ 3.2). Thus, Minitube of America has retained an appropriate measure of control necessary to establish that it has not abandoned its mark through its current license. *See, e.g. Restatement (Third) of Unfair Competition*, §§ 30, 33. As to the planned transfer of the marks, that transfer has not occurred yet, and, in the meantime, Minitube of America retains its trademark rights and control over their use; thus, as a matter of fact, Minitube of America simply has not abandoned its marks.

For these reasons, the Court must deny the defendants' motion for summary judgment on Minitube of America's trademark infringement claims.

### 2.2.4.1.2   Minitube of America's Motion

Minitube of America seeks entry of a judgment that the defendants infringed its trademarks, both registered and unregistered (Docket #47 at 8–14), doing so willfully (Docket #47 at 14–15).

To prove trademark infringement under 15 U.S.C. § 1125(a), "'a plaintiff must show (1) that its trademark may be protected and (2) that the relevant group of buyers is likely to confuse the alleged infringer's products or services with those of plaintiff.'" *H-D Michigan, Inc. v. Top Quality Service, Inc.*, 496 F.3d 755, 759 (quoting *Form Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 439 (7th Cir. 1990)).

Minitube of America has satisfied the first of those two elements for both its registered and unregistered trademarks. Minitube of America's trademark infringement claims cover both registered (the "MINITUBE" mark, U.S. Reg. No. 2,038,251; the MOFA mark, U.S. Reg. No. 2,051,949; and the ovum mark, U.S. Reg. No. 2,096,385 (Docket #47 at 8–9))   and unregistered marks (the "US BAG" mark (Docket #47 at 12–14)).

As to the registered marks, their registration creates a rebuttable presumption of their validity and protectability and Minitube of America's exclusive right to use that mark. *See, e.g.*, 15 U.S.C. §§ 1065, 1115(a–b); *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 672–73 (7th Cir. 2001). The defendants have not even attempted to rebut that presumption. Those marks, thus, satisfy the protectability element of a trademark claim.

Likewise, although the US BAG mark was unregistered at the time that the defendants began to use it, the mark still satisfies the protectability element. To begin, the mark is now registered, creating a rebuttable

presumption of protectability which the defendants have not attempted to overcome. 15 U.S.C. § 1115(a–b).

The second element of a trademark infringement claim—likelihood of confusion—presents a much closer call. The Seventh Circuit generally looks to the following seven factors to determine whether there is a likelihood of confusion:

(1)  the similarity between the marks in appearance and suggestion;

(2)  the similarity of the products;

(3)  the area and manner of concurrent use;

(4)  the degree of care likely to be exercised by consumers;

(5)  the strength of the plaintiff's mark;

(6)  any actual confusion; and

(7)  the intent of the defendant to "palm off" his product as that of another.

*Bd. of Regents of University of Wisconsin Sys. v. Phoenix Intern. Software, Inc.*, 653 F.3d 448, 454 (7th Cir. 2011) (citing *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008)). This is typically treated as a question of fact for the jury. *Bd. of Regents*, 653 F.3d at 452 (citing *AutoZone*, 543 F.3d at 929). Thus, because it is the movant on this issue, Minitube of America bears the burden to show that—even with the Court drawing all reasonable inferences in favor of the defendants—there are no genuine issues of material fact, and that the facts require judgment in its favor. *See, e.g.*, *Brilliant Instruments*, 707 F.3d at 1344; *Bd. of Regents*, 653 F.3d at 452; Fed. R. Civ. P. 56.

That is a heavy burden to carry, but Minitube of America has done so. The facts show very clearly that five of the seven factors are satisfied. To begin, the parties' marks are not only very similar—they are virtually

identical. The defendants' catalog contained various Minitube of America's trademarks and the US BAGs distributed at the trade show demonstrate this clearly. Both bags feature an identical ovum mark and an identical version of the US BAG mark. The square "minitüb" logo on the defendants' US BAG is extremely similar to the MOFA and MINITUBE marks: both are written in very similar fonts and feature extremely similar words ("minitüb" versus "minitube") in lower-case letters.


MOFA US BAG


Minitüb US BAG

The second and third factors are also satisfied. As to the second, the products are not only similar—they are identical. Neither party has offered any substantive difference between the products being offered. Likewise, as to the third factor, the markets for the products are identical. Both products are intended to serve the North American livestock reproduction market.

The fourth factor does not weigh clearly in favor of or against a finding of infringement. This factor—the degree of care likely to be exercised

by consumers—is somewhat difficult to analyze. That is because the products are specialized. They are used in a very specific field, where consumers are more sophisticated. *See, e.g., Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997). Consumers in that field may exercise a greater deal of care, such that they would readily identify differences between the parties' competing products. However, with that said, there are other reasons that consumers may not exercise that degree of care. For example, the US BAGs are not the most expensive products offered by the defendants; a 100-pack of US BAGs from the defendants is listed priced at $52.00, whereas the defendants offer products costing far more (semen-collection systems at $2,000.00 to $4,000.00; lab equipment ranging into the thousands of dollars). (Docket #38, Ex. C). While the consumers in this field may be more discerning, they are likely to be less so when adding the relatively low-cost US BAGs to otherwise high-dollar-amount purchases. In other words, the consumers of US BAGs are not likely to pay attention to the manufacturer of US BAGs, which cost only about $50.00 per pack, when they may often be making other, larger purchases. The Court, nonetheless, will not treat this factor as favoring either side.

The fifth and sixth factors, on the other hand, favor a finding of trademark infringement. As to the fifth factor, the plaintiff's marks are strong. When analyzing the strength of a mark, the Court asks whether the mark tends "to indicate the origin of the product in the eyes of the purchasing public," or, in other words, "whether the mark is strong enough that the public will form an association between the mark and the source of that particular good." *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) (citing *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979);

2 *McCarthy, Trademarks and Unfair Competition* § 11:73 (4th ed. 2003)). Minitube of America has been using its marks for many years and, undoubtedly, given the relatively small class of consumers they have been selling to, an association has been formed between the marks and Minitube of America as the source of products sold with those or similar marks. Similarly, there has been actual confusion, seeing as one of the defendants' purchasers of "Minitüb"-branded products called Minitube of America with complaints about the shipping condition of those products. For these reasons, the Court finds that both the fifth and sixth factors weigh clearly in favor of a finding of trademark infringement.

Finally, the seventh factor does not clearly weigh in either direction. That factor asks whether the defendants are trying to pass their products off as having been manufactured by Minitube of America. The answer is likely "no." To be sure, the products have been marked "Minitüb," as opposed to "Minitube" or "Minitube of America." But, clearly, the defendants are trying to disrupt Minitube of America's corner of the market by selling virtually identical products. In the end, neither party has submitted substantial evidence on this factor, and the Court will not treat it as favoring any conclusion.

Nonetheless, the Court has found that five factors weigh strongly in favor of a finding of trademark infringement; the remaining two factors do not weigh in either direction. Given that balance, the Court finds that there is little doubt that the defendants have violated Minitube of America's trademarks.

The next question is whether that infringement was willful. This matters because the Court *must* award reasonable attorney's fees in addition

to treble damages if it finds that the defendants willfully infringed Minitube of America's trademark knowing their marks to be counterfeit. 15 U.S.C. § 1117(b). The only exception to that requirement is if the Court finds "extenuating circumstances." *Id.* There are, accordingly, three questions to answer here: first, whether the defendants placed a "counterfeit" mark on their products; second, whether they did so "willfully"; and, third, if the Court has answered the first two questions in the affirmative, whether there are "extenuating circumstances," such that the Court should not enter an award of attorney's fees and treble damages against the defendants.

As to the first question, the defendants' marks were not "counterfeit." In *Gabbanelli Accordions & Imports, LLC v. Gabbanelli*, the Seventh Circuit discussed two opposing scenarios—the second constituting use of a counterfeit mark, while the first does not:

> For example, a product licensed to be sold only in Europe but sold in the United States under the licensor's trademark would be a "grey market" good rather than a good sold by means of a "counterfeit" mark.…But Italian Gabbanelli placed the Gabbanelli mark on accordions made by a company that was not authorized to manufacture accordions for sale in the United States under the Gabbanelli name; this made its use of the name counterfeiting.

575 F.3d 693, 698 (7th Cir. 2009) (citing *Idaho Potato Commission v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 722 (9th Cir. 2005); Louis P. Petrich, *Preliminary Injunctions and Temporary Restraining Orders in Copyright and Trademark Infringement Cases: The Trademark Counterfeiting Act*, 326 PLI/Pat 499, 570–71 (1991)). Under that formulation, the defendants' use of the marks more closely resembles the first situation, and therefore does not constitute counterfeiting. At the very least, Minitüb Germany had a license to sell products with the marks in question throughout the entire world, excluding

North America. They did so for many years without any issue. Thus, this situation seems to fall squarely within the Seventh Circuit's first formulation. It also does *not* fall into the second formulation, because Minitüb Germany *was* authorized to manufacture accordions for sale in the United States under the Minitube of America name. Again, they did so for years, with the exception of a small window of time when Minitube of America performed manufacturing services on behalf of both companies.

Having found that the first element of entitlement to relief under 15 U.S.C. § 1117(b) is not satisfied, the Court does not need to delve any deeper into the willfulness argument.[23] Minitube of America has not satisfied its burden on this issue.

---

[23]The Court makes two points on this issue. First, while Minitube of America quoted 15 U.S.C. § 1117(a)'s language regarding exceptional circumstances, it never fleshed out that argument or provided any support for a finding of exceptionality. Therefore, the Court does not rule in either party's favor on that issue.

Second, if the Court were to have found counterfeiting, it would have been required to enter an award of attorney's fees and treble damages pursuant to 15 U.S.C. § 1117(b). To begin, if even willful blindness can justify a finding of willfulness under 15 U.S.C. § 1117(b), then willfulness would certainly be satisfied here, given the defendants' full awareness of Minitube of America's trademark rights. *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 592 (7th Cir. 2007), *overruled on other grounds by McCarter v. Ret. Plan For Dist. Managers of Am. Family Ins. Grp.*, 540 F.3d 649 (7th Cir. 2008). Additionally, "extenuating circumstances" exist only in "extreme cases—cases in which 'the imposition of treble damages would mean that [the defendant] would be unable to support his or her family.'" *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989) (quoting Joint Statement on Trademark Counterfeiting Legislation, 130 Cong.Rec. at H12083 (daily ed. Oct. 10, 1984); citing *Fendi S.A.S. di Paola Fendi e Sorelle v. Cosmetic World, Ltd.*, 642 F. Supp. 1143, 1147 (S.D.N.Y. 1986)). In any event, the existence of "extenuating circumstances" is an affirmative defense and, therefore, is waived if the defendants do not raise it. *Lorillard*, 504 F.3d at 595 (citing *Louis Vuitton*, 875 F.2d at 590). As the Court will discuss further, the defendants did not raise this—or really *any*—defense against Minitube of America's motion for summary judgment on the trademark infringement and willfulness issue. Accordingly, they waived it.

For these reasons, the Court is obliged to grant Minitube of America's motion for summary judgment on its claim of trademark infringement, leaving open the issue of damages for trial. However, the Court must deny Minitube of America's motion insofar as it seeks a finding of willfulness.

To close this section, the Court notes that the defendants largely ignored Minitube of America's trademark infringement claims, arguing only that Minitube of America abandoned the marks (Docket #82 at 20) and, perhaps, that the trademarks were part of an implied license granted by Minitube of America to the defendants (the implied-license argument is made throughout the defendants' briefs and proposed facts, and includes arguments about the logo's designer, Minitüb Germany's use of the mark outside of the United States, and Minitüb Germany's role as a manufacturer of Minitube of America's products). The Court has already dispensed with the abandonment argument. As to the implied-license argument, the Court reiterates that there is simply no evidence that the parties ever reached any agreement that would allow the defendants to use the trademarks in question. No matter how involved Minitüb Germany may have been in the creation of the trademarks and use outside of the United States, that does not alter the fact that Minitube of America is the sole registrant of the marks and that Minitüb Germany always operated as if it did not have a license to use the trademark in the United States (showing that, if there was an implied license, it did not provide for use in the United States). Finally, as the Court mentioned in footnote 23, the defendants entirely ignored Minitube of America's 15 U.S.C. § 1117(b) arguments related to attorney's fees and damage-trebling. They were fortunate that the Court ultimately found for

them on that issue, but it was not through their doing. As this case progresses forward toward trial, such oversights may not come out quite as favorably.

### 2.2.4.2 The Defendants' Infringement Claim Against Minitube of America

The defendants allege an infringement claim against Minitube of America. Unfortunately, in their brief opposing Minitube of America's motion for summary judgment on that claim, the defendants took the same sort of blasé approach they applied to briefing Minitube of America's motion for summary judgment in its favor on its trademark infringement claims. (Docket #82 at 23).

The defendants purport that Minitube of America has infringed the defendants' "ANDROSTAR" and "ANDROCOLL" marks. Minitube of America argues that it could not have done so, because: (1) the defendants never used the ANDROSTAR mark in the United States; and (2) Minitube of America was entitled, under the first sale or exhaustion doctrine, to use the ANDROCOLL mark.

The first of those arguments succeeds, and the Court will grant Minitube of America's motion for summary judgment on the defendants' ANDROSTAR-based trademark infringement claim, dismissing that claim. Minitüb Germany obtained U.S. Reg. No. 2,493,812, covering the ANDROSTAR trademark, in 2001. (SF ¶¶ 35–37). Minitube of America is currently challenging that registration. (SF ¶ 38). But, while that challenge is pending, the registration of that mark creates a rebuttable presumption of its validity and protectability and Minitüb Germany's exclusive right to use and license that mark. *See, e.g.*, 15 U.S.C. §§ 1065, 1115(a–b); *CAE, Inc.*, 267 F.3d at 672–73. Minitube of America has overcome that presumption. It is certainly correct that registration, alone, determines ownership, but instead that use

in commerce is most important. *See, e.g., Central Mfg., Inc. v. Brett*, 492 F.3d 876, 881 (7th Cir. 2007) (citing *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992)); *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 433–34 (7th Cir. 1999). "A party may acquire a protectable right in a trademark only through use of the mark in connection with its product." *Id.* (citing *Zazu*, 979 F.2d at 503). This is accomplished by adoption of the mark and use in a way to identify the goods to the public as those of the mark's alleged owner. *Johnny Blastoff*, 188 F.3d at 433–34 (quoting *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979)). Seeing as Minitüb Germany never used its mark in the United States—instead, Minitube of America was the only United States-based user—the Court finds that Minitüb Germany never adopted the mark in the United States, meaning that it never had a protectable interest therein. Moreover, because Minitube of America was the United States-based seller of the ANDROSTAR-marked items, Minitüb Germany never used the mark in a way to identify goods as being its own. Accordingly, Minitube of America has shown that Minitüb Germany never had a protectable interest in the ANDROSTAR mark. Thus, Minitube of America could not have infringed that mark. Moreover, Minitube of America's established use likely satisfies 15 U.S.C. § 1115(b)(5)'s terms, providing another way for Minitube of America to rebut the presumption of validity. For all of these reasons, the Court is obliged to find that Minitube of America did not infringe the asserted ANDROSTAR trademark.

Likewise, Minitube of America did not infringe the ANDROCOLL mark. Under the first sale doctrine,

> resale by the first purchaser of the original article under the producer's trademark is generally neither trademark infringement nor unfair competition…[because] "trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold."

*Enesco Corp. v. Price/Costco, Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998) (quoting *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987); citing *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995); *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368–69 (1924); *Monte Carlo Shirt, Inc. v. Daewoo Int'l (Am.) Corp.*, 707 F.2d 1054, 1058 (9th Cir. 1983)); *see also Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 644 (1st Cir. 1992)*; Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996)*; Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302–03 (3d Cir. 1998); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1302 (5th Cir. 1997); *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001). That is precisely the case here: Minitube of America was the first purchaser of ANDROCOLL products from Minitüb Germany, who of course knew of Minitube of America's intent to resell the products. Therefore, Minitube of America's use of the ANDROCOLL mark (assuming it is protectable) in relation to its sales of ANDROCOLL products does not constitute trademark infringement.

Accordingly, the Court is obliged to grant Minitube of America's motion for summary judgment on the defendants' trademark infringement claims.

### 2.2.5   False Advertising Claim Against the Defendants

The Supreme Court recently discussed the rights of parties to sue for false advertising under 15 U.S.C. § 1125(a). It held that "a plaintiff suing under [15] U.S.C. § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark, Intern., Inc. v. Static Control Components, Inc.*, --- U.S. ---, 134 S.Ct. 1377, 1391 (2014). That formulation is generally concerned with the plaintiff's ability to establish proximate cause, as evidenced by the Supreme Court's further statement that such "showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff." *Id.*

The defendants challenge Minitube of America's right to sue for false advertising on the basis that it lacks the right to do so. (Docket #57 at 20–21; Docket #96 at 13–14). Doing so, they cite the *Lexmark* case, arguing that Minitube of America must establish its injury to have the right to sue for false advertising, pursuant to 15 U.S.C. § 1125(a). (Docket #96 at 13–14).

That is true, and Minitube of America cannot satisfy its burden. Minitube of America asserts that it lost a regular purchaser of one of its products after the defendants allegedly contacted that customer and falsely informed the customer that Minitube of America would no longer be able to supply that product. (Docket #70, ¶¶ 2–10). However, single assertion is based on inadmissible hearsay: the declaration of Steve Gust on the topic includes hearsay-within-hearsay, specifically his statement that he received emails from a representative of Minitube of America's former customer regarding communications from Reproduction Provisions. (Docket #70,

¶¶ 2–10). The first layer of hearsay—the communications from Reproduction Provisions to the customer—does not pose a problem. Those communications regarded Minitube of America's inability going forward to provide certain products. (*See* Docket #70, Ex. A). Minitube of America does not offer the statement to prove its inability to provide products, and accordingly those statements are not offered for the truth of the matter asserted. On other hand, the second layer of hearsay—the customer's statements to Minitube of America that Reproduction Provisions had called her—is inadmissible. The customer's representative stated: "They [Reproduction Provisions] informed me that MOFA will no longer have these available per agreement with Minitube of Germany." (Docket #70, Ex. A). Minitube of America is introducing that statement to prove the truth that the defendants called its former customer with incorrect information. Accordingly, it is inadmissible hearsay.

However, even if that evidence *were* admissible, it still would not even be probative of injury. Mr. Gust asserts that he called the customer's representative on September 27, 2013—the same day that the representative sent the email in question—to address her concerns. (Docket #70, ¶ 6). Thus, Minitube of America immediately corrected any misinformation; despite that correction, the customer still withdrew its business from Minitube of America. (*See* Docket #70, ¶¶ 6, 10). Thus, Minitube of America could not possibly show that any alleged false statements caused its injuries.

Minitube of America, therefore, has not produced any evidence to establish an injury for the purpose of showing it has a right to sue under 15 U.S.C. § 1115(a). Therefore, the Court will grant the defendants' motion for summary judgment on that claim and dismiss it.

### 2.2.6 Fraudulent Representations Claim Against the Defendants

Minitube of America has agreed to dismiss its Wis. Stat. § 100.18 claim for fraudulent representations. Accordingly, the Court will grant the defendants' motion for summary judgment on that claim.

### 2.2.7 Unfair Competition Claim Against the Defendants

To establish unfair competition, Minitube of America "must show that a designation meets the definition of trademark or trade name and that the defendant[s'] use of a similar designation is likely to cause confusion." *Madison Reprographics, Inc. v. Cook's Reprographics, Inc.*, 203 Wis. 2d 226, 234, 552 N.W.2d 440 (referring to unfair competition as "action at common law for infringement of a trademark or trade name") (citing *First Wisconsin Nat'l Bank v. Wichman*, 85 Wis. 2d 54, 63, 270 N.W.2d 168 (1978) (which refers to action as one for unfair competition); *Restatement (Third) of Unfair Competition*, § 20 (1995)). For all practical purposes, this test is the same as the one the Court applied to the parties' trademark infringement claims in Section 2.2.4, *supra*. *See, e.g.*, *Rust Env't*, 131 F.3d at 1219 (citing *Spheeris Sporting Goods, Inc. v. Spheeris on Capitol*, 157 Wis. 2d 298, 308, 459 N.W.2d 581 (Wis. App. 1990); *Sears, Roebuck & Co. v. Allstate Driving School, Inc.*, 301 F. Supp. 4, 15 (E.D.N.Y. 1969); *Madison Reprographics*, 203 Wis. 2d at 238).

The Court has already found that Minitube of America's marks are protectable and trademarked, and further that the defendants' use of them is likely to cause confusion. Accordingly, the Court must likewise hold that

Minitube of America is entitled to summary judgment on its common law unfair competition claim.[24] Likewise, its damages remain a live issue for trial.

### 2.2.8 Misappropriation of Trade Secrets Claim Against Minitube of America

The defendants assert that Minitube of America has misappropriated Minitüb Germany's trade secrets in violation of Wis. Stat. § 134.90. Under that statute, no person may misappropriate a trade secret by:

(1)     acquiring the trade secret through improper means; or

(2)     disclosing the trade secret after:

    (a)     using improper means to acquire knowledge of it; or

    (b)     knowing that he or she acquired it by:

        (i)     deriving it from another person who used improper means to acquire it;

        (ii)     acquiring it under circumstances that gave rise to a duty to maintain secrecy or limit its use;

        (iii)     acquiring it though a person having a duty to maintain its secrecy or limit its use; or

        (iv)     acquiring it by mistake.

Wis. Stat. § 134.90(2). A "trade secret" is "information, including a formula, pattern, compilation, program, device, method, technique, or process," which: (1) derives economic value from not being generally known to or ascertainable by other persons; and (2) has been the subject of efforts to maintain its secrecy. Wis. Stat. § 134.90(a)(1).

---

[24] Again, Minitube of America has gotten lucky on this claim. Despite the fact that the defendants moved for summary judgment on the claim, Minitube of America did not even deign to brief it in response, although it nonetheless asserts that the defendants' motion for summary judgment on the claim should be denied. (Docket #67 at 26). To be sure, that is a very risky strategy that otherwise might well have resulted in the imposition of sanctions.

The issues with this claim are numerous. To begin, the Court questions whether the seven pieces of information that the defendants assert to be trade secrets actually qualify for such treatment. It appears that Minitüb Germany readily disclosed many of the alleged secrets throughout its relationship with Minitube of America, calling into question whether that information has been the subject of efforts to maintain its secrecy. (*E.g.*, PPFF ¶¶ 85, 91–92). Nonetheless, the defendants argue that the parties protected the information from a third-party competitor for many years. (Second DPFF ¶ 38). Taking that to be true, the Court could find that the information was subject to efforts to maintain its secrecy and, therefore, qualified to be treated as a trade secret.

But that is ultimately irrelevant, because—even if the information was protected as a trade secret—Minitube of America did not take any action barred by Wis. Stat. § 134.90(2). To begin, there is no evidence that Minitube of America *acquired* the information through improper means. Wis. Stat. § 134.90(2)(a). Likewise, despite the defendants' assertion to the contrary, which is not based on any cited evidence, there is no evidence that Minitube of America ever disclosed the information. (*See* Docket #67 at 21 (asserting that "MOFA permitted two suitors to examine any part of MOFA's business they wanted to examine, including MTI's trade secrets and confidential information, despite MTI's objections," but failing to provide a citation to the record to support that assertion.)). Without evidence that Minitube of America either acquired the information by improper means or disclosed it, the defendants cannot possibly establish that the requirements of Wis. Stat. § 134.90 are satisfied.

However, even if there was evidence that Minitube of America had disclosed the information, the defendants still could not prevail, because that disclosure would not have violated Wis. Stat. § 134.90(2)(b). As already described above, Wis. Stat. § 134.90(2)(b) prohibits disclosure of trade secrets that the discloser knows: were received from someone who obtained them by improper means; were acquired under circumstances giving rise to a duty to maintain secrecy; or were acquired by accident or mistake. There is no allegation that Minitube of America acquired the information from another person or by accident or mistake. Accordingly, the only question is whether Minitube of America disclosed the information despite a duty to maintain its secrecy. That is not the case. Minitüb Germany never required Minitube of America to enter into non-disclosure agreements (as it did with employees, distributors, and Reproduction Provisions) nor did it label documents containing alleged trade secrets "For In House Use Only" (as it did with distributors). (*See* PPFF ¶¶ 90–93 and Resps. (tellingly, the defendants acknowledge that Minitüb Germany identified many documents for "in house use" over the course of the parties' relationship, but does not identify any of the alleged trade secrets to have been labeled as such)). There is also no evidence to establish that there was any agreement or contract between the parties under which the parties agreed not to disclose information obtained from one another. Accordingly, Minitube of America never had a duty to maintain any alleged trade secrets and, therefore, could not possibly have violated Wis. Stat. § 134.90(2)(b).

Having conclusively determined that Minitube of America did not and could not have misappropriated any of Minitüb Germany's trade secrets in violation of Wis. Stat. § 134.90, the Court must also deny the defendants'

Civil Local Rule 7(h) expedited motion for relief under Rule 56(d) of the Federal Rules of Civil Procedure. In that motion, the defendants argue that the Court should "defer ruling on [Minitube of America's motion for summary judgment on the trade secrets claim], and order further discovery into the communications between" Minitube of America and the two companies who considered purchasing it. (Docket #73 at 1). With that motion, the defendants are attempting to cover their bases: they likely realize that they have not obtained evidence sufficient to establish that Minitube of America made any disclosures of trade secrets. However, even if the Court were inclined to grant the motion, doing so would not be worthwhile because further discovery on the issue of whether Minitube of America actually made any disclosures would be futile. That is because, as already discussed, Minitube of America did not have a duty to maintain any information it received. So, even if it did make disclosures, those disclosures would not violate Wis. Stat. § 134.90(2)(b).

For these reasons, the Court is obliged to grant Minitube of America's motion for summary judgment on the misappropriation of trade secrets claim, and likewise to deny the defendants' motion for relief under Rule 56(d).

### 2.2.9 Breach of Contract Claim Against Minitube of America

The defendants' breach of contract claim derives entirely from their assertions that Minitüb Germany and Minitube of America entered into some confidentiality agreement. (Docket #16, ¶¶ 61–67). All of the important allegations on that claim, found in paragraphs 62 through 66 of the parties'

answer and counterclaim, contain information about confidential business information, trade secrets, and nondisclosure obligations.[25]

The Court has already determined that Minitube of America did not have any duty or contract by which to maintain confidentiality of information provided to it by Minitüb Germany. (*See* Sec. 2.2.8, *supra*). Thus, this claim, by necessity, fails.[26] The Court will grant Minitube of America's motion for summary judgment in that regard.

### 2.2.10 Tortious Interference Claim Against Minitube of America

The defendants claim that Minitube of America has tortiously interfered with their contract. There are five elements of a tortious interference claim:

(1)     an actual or prospective contractual relationship;

(2)     interference with that contract;

(3)     the interference was intentional;

(4)     the interference caused damages; and

(5)     the interfering party was not justified or privileged to do so.

---

[25]The defendants disagree. (Resp. to PPFF ¶ 96). They maintain that "the record has a plethora of evidence to demonstrate that MOFA and MTI had several contractual agreements." (Resp. to PPFF ¶ 96). Thus, presumably, the defendants wish to seek relief for other forms of breaches of contract. However, that contention is not supported by the language in the answer and counterclaim. Moreover, the defendants have never moved to amend the answer and counterclaim to seek relief for any other alleged forms of a breach. Thus, any additional claims are not properly before the Court and the Court will not address them.

[26]Despite Minitube of America having made clear that it was seeking summary judgment on this claim (Docket #47 at 17–18), the defendants did not provide any argument in response. Their table of contents and headings intimate that they will do so (Docket #67, ii, 21), but then there is no analysis on the issue. Just as it was when Minitube of America failed to brief the unfair competition claim, this is a concerning and borderline-sanctionable failure.

*Briesemeister v. Lehner*, 2006 WI App 140, ¶ 48, 295 Wis. 2d 429, 720 N.W.2d 531; *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999).

The parties agree that the first three elements exist. (Docket #47 at 21). However, they disagree on the last two. Minitube of America asserts that, because Minitüb Germany and Reproduction Provisions are still abiding by the terms of their contract without interruption and have not suffered from lost sales, they cannot prove that any interference caused damages, so as to satisfy the fourth element of a tortious interference claim. (Docket #47 at 22). Likewise, Minitube of America argues that its means of interfering—filing this lawsuit, sending a cease and desist letter, and issuing statements about Minitüb Germany's products—are either justified or privileged by virtue of their truth. (Docket #47 at 22; #87 at 15).

As to Minitube of America's first argument, Wisconsin courts do not require a breach of contract for tortious interference to exist. *Sampson Investments by Sampson v. Jondex Corp.*, 176 Wis. 2d 55, 72, 499 N.W. 2d 177, 184 (1993) (citing *Wisconsin Power & Light Co. v. Gerke*, 20 Wis. 2d 181, 121 N.W.2d 912 (1963), which "recognized a cause of action for tortious interference with contract even though there was no breach of the contract."). So, to the extent that Minitube of America argues that the defendants' tortious interference claim will not lie because the defendants' contract is still operational, they are wrong.

Rather, so long as "the value of [the defendants'] bargain" was impaired as a result of Minitube of America's interference, the defendants may maintain their claim in spite of the fact that "there is no failure of performance." *Wisconsin Power*, 20 Wis. 2d at 187 (citing 1 Harper & James, *Law of Torts*, sec. 6.9, 499). *See also Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-

CV-178, 2011 WL 7324582, at *16 (W.D. Wis. June 7, 2011); *Quad/Graphics, Inc. v. One2One Comm's, LLC*, No. 09-CV-99, 2011 WL 1135025, at *6 (E.D. Wis. March 25, 2011); *Tele-Port, Inc. v. Ameritech Mobile Comm's, Inc.*, 49 F. Supp. 2d 1089, 1093 (E.D. Wis. 1999); *Magnum Radio, Inc. v. Brieske*, 217 Wis. 2d 130, 577 N.W.2d 377 (Ct. App. 1998). In Wisconsin, "one who, not being privileged to do so, intentionally and improperly interferes with another's performance of a contract,…[by causing] the other's performance to be more expensive or burdensome, may be subject to liability for the pecuniary loss caused thereby. *Magnum Radio*, 217 Wis. 2d at 139–140.

The Court is satisfied that there is ample evidence to show pecuniary loss on the defendants' behalf. If nothing else, as a result of this lawsuit and the cease and desist letter, they had to repackage and redesign all of the allegedly-infringing products, certainly causing performance of the contract to be more expensive. (Second DPFF ¶¶ 40–41). Likewise, Minitube of America's representations about its use of specific chemicals in its products reduced the value of the party's contract by potentially reducing Minitüb Germany's products' reputations in the marketplace. (Second DPFF ¶ 34–37). Therefore, the Court is obliged to determine that the defendants' tortious interference claim does not fail on the fourth element.

As to the fifth element, it is Minitube of America's burden to prove justification or privilege. *Select Creations, Inc. v. Paliafito Am., Inc.*, 911 F. Supp. 1130, 1159 (E.D. Wis. 1995) (citing *Chrysler Corp. v. Lakeshore Commercial Finance Corp.*, 389 F. Supp. 1216, 1221 (E.D. Wis. 1975), *aff'd*, 549 F.2d 804 (7th Cir. 1977); *W. Prosser, Law of Torts* sec. 123 (3d ed. 1964); *Federal Pants, Inc. v. Stocking*, 762 F.2d 561, 569 (7th Cir. 1985)).

Minitube of America carried that burden in part. The Court has held that Minitube of America's position on trademark infringement was correct and has allowed the patent infringement claims to escape summary judgment. On that basis, the Court is obliged to find that Minitube of America's filing of this lawsuit and cease and desist letter were justified. Accordingly, Minitube of America cannot be held liable for tortious interference with contract as a result of those activities.

On the other hand, some of Minitube of America's representations to third parties appear to be incorrect. For example, by informing third party customers that it had developed a chemical that it used exclusively, making its products superior (Second DPFF ¶¶ 34–37), Minitube of America seems to have provided false information: it did not develop the chemical or use the chemical exclusively, and its bags likely were not superior to Minitüb Germany's. At the very least, Minitube of America has not carried its burden on this point to show that its statements were *true*, such that it would be privileged to have made them.

For these reasons, the Court must grant Minitube of America's motion for summary judgment on the defendants' tortious interference claim insofar as the defendants seek to recover for Minitube of America's having filed this lawsuit or sent the defendants the cease and desist letter. However, the Court must deny Minitube of America's motion for summary judgment on the tortious interference claim insofar as that claim is based upon Minitube of America's allegedly-false communications to third parties. At trial, Minitube of America may attempt to establish the truth of its statements; meanwhile, if it cannot do so, then the defendants will have the burden to establish their damages.

3. CONCLUSION

To wrap up this extremely complicated order, the Court will summarize its holdings. It has granted summary judgment in the following respects:

(1)     In favor of the defendants on their argument that Minitube of America lacks standing to pursue its claims for injunctive relief; accordingly, Minitube of America cannot proceed on its claims to the extent it seeks injunctive relief. (Sec. 2.2.1.2, *supra*).

(2)     In favor of Minitube of America on its trademark infringement claims against the defendants; the Court having resolved the substance of this claim in Minitube of America's favor, the issue of damages on this claim remains open. (Sec. 2.2.4.1.2, *supra*).

(3)     In favor of Minitube of America on the defendants' trademark infringement claims; accordingly, the Court must dismiss this claim. (Sec. 2.2.4.2, *supra*).

(4)     In favor of the defendants on Minitube of America's false advertising claim; accordingly, the Court must dismiss this claim. (Sec. 2.2.5, *supra*).

(5)     In favor of the defendants on Minitube of America's fraudulent representations claim; accordingly, the Court must dismiss this claim. (Sec. 2.2.6, *supra*).

(6)     In favor of Minitube of America on its common law unfair competition claim against the defendants; while Minitube of America did not move for summary judgment on that claim, the outcome is compelled by the Court's analysis of Minitube of America's trademark infringement claims. Likewise, the issue of damages on this claim remains a live one for the jury. (Sec. 2.2.7, *supra*).

(7)     In favor of Minitube of America on the defendants' misappropriation of trade secrets claim; accordingly, the Court must dismiss this claim. (Sec. 2.2.8, *supra*).

(8) In favor of Minitube of America on the defendants' breach of contract claim; accordingly, the Court must dismiss this claim. (Sec. 2.2.9, *supra*).

(9) In favor of Minitube of America on the defendants' tortious interference claim, insofar as that claim is based upon Minitube of America's having filed this lawsuit or sent a cease and desist letter; accordingly, the Court must dismiss this claim to the extent described. (Sec. 2.2.10, *supra*).

It has denied summary judgment in the following respects:

(1) Against the defendants on their argument that Minitube of America lacks standing to pursue its claims for damages; accordingly, Minitube of America may proceed on its claims to the extent it seeks damages and its claims have not otherwise been dismissed as describe above. (Sec. 2.2.1.1, *supra*).

(2) Against both parties on their arguments regarding patent infringement (Sec. 2.2.2, *supra*); while the Court determined that Minitüb Germany does not have a license to sell the '503 patent in the United States (Sec. 2.2.2.1, *supra*), it found that issues of fact remained as to whether there was an offer for sale (Sec. 2.2.2.2.1, *supra*) or importation to the United States (Sec. 2.2.2.2.2, *supra*). Those issues must be presented to the jury, because the doctrine of *de minimis noncurat lex* does not apply to them. (Sec. 2.2.2.3, *supra*).

(3) Against the defendants on Minitube of America's false patent marking claim; Minitube of America stated this claim with the requisite particularity and questions of fact regarding its intent remain to be determined by the jury. (Sec. 2.2.3, *supra*).

(4) Against the defendants on Minitube of America's trademark infringement claim (Sec. 2.2.4.1.1); as already noted, the Court must grant Minitube of America's motion for summary judgment in its favor on this claim (Sec. 2.2.4.1.2, *supra*), thus leaving open only the issue of the amount of Minitube of America's damages on this claim.

(5) Against Minitube of America on the defendants' tortious interference claim, insofar as that claim is based upon Minitube of America's allegedly fraudulent statements to third parties;

the falsity of those statements and damages (if the defendants prevail on this claim) remain live issues of fact for the jury. (Sec. 2.2.10, *supra*).

The Court must also address the outstanding motions. As discussed above in Section 2.2.8, *supra*, it will deny the defendants' motion for relief under Rule 56(d) (Docket #73). The defendants also filed a motion to strike portions of Ludwig Simmet's declaration. (Docket #92; #97). The Court did not rely heavily on the challenged declaration and, where it did, it provided a rationale for its reliance thereon (*e.g.*, Sec. 2.2.4.1.1 & n.22, *supra*). The Court will, therefore, deny the defendants' motion to strike (Docket #92) as moot.

The Court has also reviewed the substantial amounts of materials submitted by the parties under seal, and which the parties have moved to seal. (Docket #31, #43, #44, #46, #66, #75, #86, #93, #95). All of the materials in question contain very sensitive business-related materials that could damage the parties if released publicly, and the Court accordingly finds good cause to seal the materials. The Court will, therefore, grant the parties' motions to seal.

As for this order, the Court has endeavored to avoid discussing specific information that should remain sealed, and the Court finds no reason to suggest that this order or any portion thereof be filed under seal. At the same time, the Court reminds the parties that the presumption is that litigation must occur in the public eye. *American Telephone & Telegraph Co. v. Grady*, 594 F.2d 594, 596 (7th Cir. 1979); Fed. R. Civ. P. 26(c); *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945–46 (7th Cir. 1999); *Hicklin Eng'r, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006).

Finally, the Court must address the state of preparation in this case. Quite clearly, the parties both have thrown practically every conceivable

claim "at the wall," hoping that something would stick. In doing so, they often ignored significant shortcomings with their claims and occasionally failed to even address the claims in their respective filings. They instead leave it to the Court to sort everything out for them. Make no mistake, that will not work at trial. At that stage, the parties will have to prepare and present their own cases. The Court makes this observation because, if the state of preparations for trial at all reflects the parties' efforts at the summary judgment stage of the proceedings, the Court has serious concerns along with significant reservations as to how well the parties' respective claims will be presented.

The Court does not relay these concerns in order to denigrate the parties' efforts. Instead, the Court simply wishes to ensure that the parties are fully prepared to present their respective cases at trial. They might begin by reading, rereading, and studying with care each of the protocols addressed in the Court's Trial Scheduling Order (Docket #13), and work closely with one another to identify any issues and facts that they can resolve prior to trial through stipulation or settlement. If they do not do so, they will find themselves challenged with an extremely bumpy ride when the day of trial rolls around.

Accordingly,

IT IS ORDERED that the Minitube of America's motion for summary judgment (Docket #32) be and the same is hereby GRANTED in part and DENIED in part, as more fully described above;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Docket #45) be and the same is hereby GRANTED in part and DENIED in part, as more fully described above;

IT IS FURTHER ORDERED that the defendants' motion for relief pursuant to Rule 56(d) (Docket #73) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendants' motion to strike the deposition of Ludwig Simmet (Docket #92) be and the same is hereby DENIED as moot; and

IT IS FURTHER ORDERED that the parties' motions to seal (Docket #31, #43, #44, #46, #66, #75, #86, #93, #95) be and the same are hereby GRANTED.

Dated at Milwaukee, Wisconsin, this 1st day of May, 2014.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge